ORAL ARGUMENT NOT YET SCHEDULED

**No. 13-3041**

IN THE

# 𝕬nited 𝕾tates 𝕮ourt of 𝕬ppeals
# for the 𝕯istrict of 𝕮olumbia 𝕮ircuit

UNITED STATES OF AMERICA,

*Appellee*,

v.

CALEB GRAY-BURRISS

*Appellant*.

On Appeal from the United States District Court
for the District of Columbia,
Criminal No. 10-00178-RWR

## OPENING BRIEF OF APPELLANT

Stephen L. Braga
Michael Baker, *Third Year Law Student*
John Gunter, *Third Year Law Student*
Stewart Inman, *Third Year Law Student*
Benjamin Wood, *Third Year Law Student*
UNIVERSITY OF VIRGINIA SCHOOL OF LAW
APPELLATE LITIGATION CLINIC
580 Massie Road
Charlottesville, Virginia 22903-1738
(434) 924-3825
stevebraga@virginia.edu

*Additional Counsel for Appellant*

Steven M. Klepper
KRAMON & GRAHAM, P.A.
One South Street, Suite 2600
Baltimore, Maryland 21202-3201
(410) 752-6030
sklepper@kg-law.com

*Appointed Counsel for Appellant*

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

### A.  <u>Parties</u>

The only parties are Caleb Gray-Burriss and the United States of America.

### B.  <u>Rulings</u>

Appellant seeks review of the following District Court rulings, all incorporated into the final judgment entered April 30, 2013, that is under appeal:

- the rulings of November 20, 21, and 26, 2012 prohibiting Gray-Burriss from using for any purpose evidence that was not produced in response to a Rule 17 subpoena or Rule 16 discovery (A695-97; A764-65; A836-37; A848-50);

- the November 2, 2012 decision to proceed with trial without holding the requested hearing on the pending show-cause order (A246-47);

- the April 8, 2013 ruling denying Defendant's post-verdict motions (A1058-64); and

- the April 8 and May 8, 2013 calculation of loss amount, forfeiture, and restitution, for purposes of Gray-Burriss' sentence (A1065-77; A211-13).

### C.  <u>Related Cases</u>

None.

13259/1/01515191.DOCXv2

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ......................................................................................... ii

  A. Parties ............................................................................... ii

  B. Rulings .............................................................................. ii

  C. Related Cases .................................................................... ii

TABLE OF CONTENTS ............................................................... iii

TABLE OF AUTHORITIES ........................................................... vi

GLOSSARY OF ABBREVIATIONS .............................................. ix

JURISDICTIONAL STATEMENT ................................................. 1

ISSUES PRESENTED .................................................................. 1

STATUTES AND REGULATIONS ................................................ 1

  18 U.S.C. § 371 ................................................................... 1

  18 U.S.C § 401 .................................................................... 2

  18 U.S.C. § 1341 ................................................................. 2

  18 U.S.C. § 1512(c) ............................................................. 2

  29 U.S.C. § 431 ................................................................... 3

  29 U.S.C. § 436 ................................................................... 5

  29 U.S.C. § 439 ................................................................... 5

  29 U.S.C. § 501(c) ............................................................... 6

STATEMENT OF THE CASE ....................................................... 6

  1. Gray-Burriss Runs NASPSO Energetically But Chaotically ..................... 6

  2. CJA Counsel Is Appointed and Assists with NASPSO Subpoenas .................. 7

  3. Christmas Arrives Unprepared ........................................ 8

  4. Defense Counsel Is Ordered to Show Cause for Their Defaults .................. 10

  5. The District Court Refuses to Address the Show-Cause Order Until After Trial ......... 12

  6. Defense Counsel Bungle Their Way Through Trial ................ 13

13259/1/01515191.DOCXv2

7.  Both Defense Attorneys Confess to Gross Malpractice ..............................14

8.  The Jury's Special Verdict Reveals Its Acceptance of False Facts ................................................................16

9.  The District Court, Finding No Deficiencies in Counsel, Sentences Gray-Burriss ............................................16

SUMMARY OF ARGUMENT ...............................................16

ARGUMENT .........................................................................18

I.  DISCOVERY SANCTIONS ............................................18

A. Standard of Review .....................................................18

B. Applicable Law............................................................19

C. Exclusion of the Executed July 1, 2009 Employment Agreement.................20

1.  The 2009 Agreement, If Genuine, Is Valid Under the Government's Theory of the Case................................20

2.  The Signed Agreement, Found in Paychex's Records, Was Indisputably Genuine...............................24

3.  The District Court Abused Its Discretion.....................25

a.  Lack of Authority to Exclude Evidence as a Sanction for Noncompliance with Grand Jury Subpoenas ....................................25

b.  Application of Wrong Rule 16 Analysis ..............26

c.  Undue Severity of Sanction.................................27

D. Exclusion of Fraser's Signed Employment Agreement .................................30

E. Prejudice .....................................................................32

II.  INEFFECTIVE ASSISTANCE .........................................37

A. Standard of Review .....................................................37

B. Conflict of Interest.......................................................38

1.  The Record Plainly Shows that Personal Conflicts of Interest Disabled Defense Counsel........................38

2.  The Record Plainly Shows that Defense Counsel Faced Disabling Personal Conflicts of Interest ..................39

3.  Alternatively, Remand Is Necessary Because the District Court Failed to Satisfy Its Duty of Inquiry........................47

C. Traditional *Strickland* Ineffective Assistance ..............50

    1.  Defense Counsel's Inarguably Deficient Performance ...........................50

    2.  Prejudice Is Clear from the Record and Certainly Warrants at Least a Remand ...............................................................................................58

CONCLUSION ...................................................................................................62

CERTIFICATE OF COMPLIANCE .....................................................................63

CERTIFICATE OF SERVICE .............................................................................63

13259/1/01515191.DOCXv2

# TABLE OF AUTHORITIES[*]

## Cases

*Armienti v. United States*, 234 F.3d 820 (2d Cir. 2000) .................................... 39, 46

[*]*Atley v. Ault*, 191 F.3d 865 (8th Cir. 1999) ..................................................... 48-49

*Atty. Grievance Comm'n of Md. v. Goodman*,
   43 A.3d 988 (Md. 2012) .................................................................................. 53

*California v. Bonin*, 765 P.2d 460 (Cal. 1989) ................................................ 48

*Carter v. Virginia*, 400 S.E.2d 540 (Va. Ct. App. 1991) ....................................... 49

*Cuyler v. Sullivan*, 446 U.S. 335 (1980) .......................................................... 38, 48

*Herring v. New York*, 422 U.S. 853 (1975) ....................................................... 45

*Jacobellis v. Ohio*, 378 U.S. 184 (1964) ........................................................... 60

*Kickapoo Tribe v. Babbitt*, 43 F.3d 1491 (D.C. Cir. 1995) ............................... 19

*Koon v. United States*, 518 U.S. 81 (1996) ....................................................... 18

*Kotteakos v. United States*, 328 U.S. 750 (1946) .......................................... 33

*Leigh v. United States*, 308 F.2d 345 (D.C. Cir. 1962) ........................................ 33

*Mickens v. Taylor*, 535 U.S. 162 (2002) ........................................................... 39

*Minnesota v. Paige*, 765 N.W.2d 134 (Minn. Ct. App. 2009) ................................. 49

*Nilva v. United States*, 352 U.S. 385 (1957) ..................................................... 25

*Nix v. Williams*, 467 U.S. 431 (1984) ............................................................... 29

*Stoia v. United States*, 109 F.3d 392 (7th Cir. 1997) .................................... 41

*United States v. Bruce*, 89 F.3d 886 (D.C. Cir. 1996) ............................................ 39

*United States v. Cronic*, 466 U.S. 648 (1984) ........................................... 50

*United States v. Day*, 524 F.3d 1361 (D.C. Cir. 2008) ........................................... 19

[*]*United States v. DeFries*, 129 F.3d 1293 (D.C. Cir. 1997) .......................... 51

*United States v. Gannt*, 140 F.3d 249 (D.C. Cir. 1998) ........................................ 38

*United States v. Green*, 680 F.2d 183 (D.C. Cir. 1982) ........................................ 48

*United States v. Greig*, 967 F.2d 1018 (5th Cir. 1992) ....................................... 46-47

---

[*] Authorities upon which we chiefly rely are marked with asterisks.

*United States v. Hammond*, 201 F.3d 346 (5th Cir. 1999) .......................................54

\*United States v. Hurt, 543 F.2d 162 (D.C. Cir. 1976).............................................41

*United States v. Hylton*, 294 F.3d 130 (D.C. Cir. 2002)............................. 41-44, 46

\*United States v. Marshall, 132 F.3d 63 (D.C. Cir. 1998)...................... 18-20, 26-28

*United States v. Mohammed*, 692 F.3d 192 (D.C. Cir. 2012)..................................61

*United States v. Moore*, 651 F.3d 30 (D.C. Cir. 2011) .......................................37, 61

*United States v. Old Dominion Boat Club*,
630 F.3d 1039 (D.C. Cir. 2011)........................................................................19

*United States v. Palmera Pineda*,
592 F.3d 199 (D.C. Cir. 2010)......................................................................32, 36

*United States v. Rashad*, 396 F.3d 398, 401 (D.C. Cir. 2005) ...............................19

*United States v. Rooney*, 37 F.3d 847 (2d Cir. 1994) .............................................35

*United States v. Sampogne*, 533 F.2d 766 (2d Cir. 1976) ......................................25

*United States v. Sarcinelli*, 667 F.2d 5 (5th Cir. 1982) ..........................................19

*United States v. Shabban*, 612 F.3d 693 (D.C. Cir. 2010).....................................61

*United States v. Shark*, 51 F.3d 1072 (D.C. Cir. 1995) .....................................39, 46

*United States v. Tann*, 532 F.3d 868 (D.C. Cir. 2008) ...........................................19

*United States v. Tatum*, 943 F.2d 370 (4th Cir. 1991)............................................41

*United States v. Taylor*, 139 F.3d 924 (D.C. Cir. 1998).........................................39

*United States v. Todd*, 287 F.3d 1160 (D.C. Cir. 2002) .........................................50

*United States v. Williams*, 358 F.3d 956 (D.C. Cir. 2004);  ............................ 60-61

*Ward v. United States*, 995 F.2d 1317 (6th Cir. 1993) ...........................................51

*Wheat v. United States*, 486 U.S. 153 (1988) ........................................................47

\*Wood v. Georgia, 450 U.S. 261 (1981).......................................................41, 47, 50

## **Statutes**

18 U.S.C. § 371 .........................................................................................................1

18 U.S.C § 401 ......................................................................................................2, 25

18 U.S.C. § 1341 .......................................................................................................2

18 U.S.C. § 1512 .......................................................................................................2

18 U.S.C. § 3663 .................................................................................57

29 U.S.C. § 431 ....................................................................................3

29 U.S.C. § 436 ....................................................................................5

29 U.S.C. § 439 ....................................................................................5

29 U.S.C. § 501 ..............................................................................6, 28

28 U.S.C. § 1291 ..................................................................................1

**Rules**

Fed. R. App. P. 4 .................................................................................1

Fed. R. Crim. P. 12.1 .........................................................................26

Fed. R. Crim. P. 12.2 .........................................................................26

Fed. R. Crim. P. 12.3 .........................................................................26

Fed. R. Crim. P. 16.................................17, 19, 25-27, 29, 32, 55-56

Fed. R. Crim. P. 17...............................................................17, 25, 32

Fed. R. Crim. P. 42.............................................................................25

Fed. R. Crim. P. 51.............................................................................19

Fed. R. Evid. 612...............................................................................30

Fed. R. Evid. 804.......................................................................... 53-54

**Sentencing Guideline**

U.S. Sentencing Guidelines Manual § 2B1.1 .......................................33

**Other Authorities**

9A Fed. Proc., L. Ed. § 22:1178 .........................................................19

## GLOSSARY OF ABBREVIATIONS

CJA................................................................................Criminal Justice Act

DOL........................................................................Department of Labor

ERISA ......................................Employee Retirement Income Security Act of 1974

NASPSO ................... National Association of Special Police and Security Officers

NLRB .................................................................. National Labor Relations Board

13259/1/01515191.DOCXv2

## JURISDICTIONAL STATEMENT

The District Court asserted subject-matter jurisdiction over this action alleging violations of federal criminal statutes. A49-87. The District Court entered final judgment on April 29, 2013. A202-09; A29. This Court has jurisdiction under 28 U.S.C. § 1291 and Fed. R. App. P. 4(a)(1)(A) because Gray-Burriss noted an appeal on May 1, 2013. A210.

## ISSUES PRESENTED

1.     Did the District Court abuse its discretion by excluding defense exhibits (including indisputably genuine documentary evidence) and, by virtue of that exclusion, allowing the jury to find false facts?

2.     Do defense counsel's admitted conflict of interest, and admitted malpractice, warrant reversal, or at least a remand for a hearing on violations of Gray-Burris' Sixth Amendment right to counsel?

## STATUTES AND REGULATIONS

### <u>18 U.S.C. § 371</u>

If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined under this title or imprisoned not more than five years, or both.

If, however, the offense, the commission of which is the object of the conspiracy, is a misdemeanor only, the punishment for such conspiracy shall not exceed the maximum punishment provided for such misdemeanor.

1

**18 U.S.C § 401**

A court of the United States shall have power to punish by fine or imprisonment, or both, at its discretion, such contempt of its authority, and none other, as –

**(1)** Misbehavior of any person in its presence or so near thereto as to obstruct the administration of justice;

**(2)** Misbehavior of any of its officers in their official transactions;

**(3)** Disobedience or resistance to its lawful writ, process, order, rule, decree, or command.

**18 U.S.C. § 1341**

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or to sell, dispose of, loan, exchange, alter, give away, distribute, supply, or furnish or procure for unlawful use any counterfeit or spurious coin, obligation, security, or other article, or anything represented to be or intimated or held out to be such counterfeit or spurious article, for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or deposits or causes to be deposited any matter or thing whatever to be sent or delivered by any private or commercial interstate carrier, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail or such carrier according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined under this title or imprisoned not more than 20 years, or both.

**18 U.S.C. § 1512(c)**

Whoever corruptly –

**(1)** alters, destroys, mutilates, or conceals a record, document, or other object, or attempts to do so, with the intent to impair the

object's integrity or availability for use in an official proceeding; or

**(2)** otherwise obstructs, influences, or impedes any official proceeding, or attempts to do so,

shall be fined under this title or imprisoned not more than 20 years, or both.

## 29 U.S.C. § 431

**(a)** Adoption and filing of constitution and bylaws; contents of report

Every labor organization shall adopt a constitution and bylaws and shall file a copy thereof with the Secretary, together with a report, signed by its president and secretary or corresponding principal officers, containing the following information--

**(1)** the name of the labor organization, its mailing address, and any other address at which it maintains its principal office or at which it keeps the records referred to in this subchapter;

**(2)** the name and title of each of its officers;

**(3)** the initiation fee or fees required from a new or transferred member and fees for work permits required by the reporting labor organization;

**(4)** the regular dues or fees or other periodic payments required to remain a member of the reporting labor organization; and

**(5)** detailed statements, or references to specific provisions of documents filed under this subsection which contain such statements, showing the provision made and procedures followed with respect to each of the following: (A) qualifications for or restrictions on membership, (B) levying of assessments, (C) participation in insurance or other benefit plans, (D) authorization for disbursement of funds of the labor organization, (E) audit of financial transactions of the labor organization, (F) the calling of regular and special meetings, (G) the selection of officers and stewards and of any representatives to other bodies composed of labor organizations'

3

representatives, with a specific statement of the manner in which each officer was elected, appointed, or otherwise selected, (H) discipline or removal of officers or agents for breaches of their trust, (I) imposition of fines, suspensions, and expulsions of members, including the grounds for such action and any provision made for notice, hearing, judgment on the evidence, and appeal procedures, (J) authorization for bargaining demands, (K) ratification of contract terms, (L) authorization for strikes, and (M) issuance of work permits. Any change in the information required by this subsection shall be reported to the Secretary at the time the reporting labor organization files with the Secretary the annual financial report required by subsection (b) of this section.

**(b)** Annual financial report; filing; contents

Every labor organization shall file annually with the Secretary a financial report signed by its president and treasurer or corresponding principal officers containing the following information in such detail as may be necessary accurately to disclose its financial condition and operations for its preceding fiscal year--

**(1)** assets and liabilities at the beginning and end of the fiscal year;

**(2)** receipts of any kind and the sources thereof;

**(3)** salary, allowances, and other direct or indirect disbursements (including reimbursed expenses) to each officer and also to each employee who, during such fiscal year, received more than $10,000 in the aggregate from such labor organization and any other labor organization affiliated with it or with which it is affiliated, or which is affiliated with the same national or international labor organization;

**(4)** direct and indirect loans made to any officer, employee, or member, which aggregated more than $250 during the fiscal year, together with a statement of the purpose, security, if any, and arrangements for repayment;

**(5)** direct and indirect loans to any business enterprise, together with a statement of the purpose, security, if any, and arrangements for repayment; and

4

(**6**) other disbursements made by it including the purposes thereof;

all in such categories as the Secretary may prescribe.

(**c**) Availability of information to members; examination of books, records, and accounts

Every labor organization required to submit a report under this subchapter shall make available the information required to be contained in such report to all of its members, and every such labor organization and its officers shall be under a duty enforceable at the suit of any member of such organization in any State court of competent jurisdiction or in the district court of the United States for the district in which such labor organization maintains its principal office, to permit such member for just cause to examine any books, records, and accounts necessary to verify such report. The court in such action may, in its discretion, in addition to any judgment awarded to the plaintiff or plaintiffs, allow a reasonable attorney's fee to be paid by the defendant, and costs of the action.

## 29 U.S.C. § 436

Every person required to file any report under this subchapter shall maintain records on the matters required to be reported which will provide in sufficient detail the necessary basic information and data from which the documents filed with the Secretary may be verified, explained, or clarified, and checked for accuracy and completeness, and shall include vouchers, worksheets, receipts, and applicable resolutions, and shall keep such records available for examination for a period of not less than five years after the filing of the documents based on the information which they contain.

## 29 U.S.C. § 439

(**a**) Any person who willfully violates this subchapter shall be fined not more than $10,000 or imprisoned for not more than one year, or both.

(**b**) Any person who makes a false statement or representation of a material fact, knowing it to be false, or who knowingly fails to disclose a material fact, in any document, report, or other information

required under the provisions of this subchapter shall be fined not more than $10,000 or imprisoned for not more than one year, or both.

**29 U.S.C. § 501(c)**

Any person who embezzles, steals, or unlawfully and willfully abstracts or converts to his own use, or the use of another, any of the moneys, funds, securities, property, or other assets of a labor organization of which he is an officer, or by which he is employed, directly or indirectly, shall be fined not more than $10,000 or imprisoned for not more than five years, or both.

## STATEMENT OF THE CASE

### 1.    Gray-Burriss Runs NASPSO Energetically But Chaotically

Caleb Gray-Burriss founded the National Association of Special Police and Security Officers ("NASPSO") in 1993. A792. A quirk of labor law is that security guards may not be in the same union with non-security guards. A789. Gray-Burriss worked tirelessly to build NASPSO, and then to re-build it after a soured merger with a larger security guard union in 2004. A196-97; A792-97.

For all his hard work, Gray-Burriss' recordkeeping was disastrous. NASPSO's records were in complete disarray. A687; A773; A813; A889. His mishandling of ERISA funds led to a consent civil judgment in April 2007. A1078-86.

NASPSO had a constitution, A1120-56, but NASPSO rarely followed it. An executive board of six national officers was supposed to approve and modify officers' salaries. A1128-33. In practice, the executive board consisted of one to

6

two national officers enumerated in the constitution, plus various other local and national officers. *Infra* § I.C.1. From when Gray-Burriss first starting taking a salary in 2004 to his final pay raise in April 2011, NASPSO failed to follow its constitutional procedures for authorizing his salary. *Id.* The Government would concede that pay raises authorized in this manner were valid. A514-16.

The Government accused Gray-Burriss using NASPSO as his "piggy bank." A1023. Its central theme was that the gaps in NASPSO's records reflected Gray-Burriss deliberate concealment of his fraudulent scheme. A942-44.

### 2. CJA Counsel Is Appointed and Assists with NASPSO Subpoenas

Gray-Burriss was indicted in June 2010. A31-38. H. Heather Shaner was appointed as CJA counsel. A5.

The Government subpoenaed NASPO's custodian of records, A1164-71, and, when there was no response, the District Court entered a compulsion order. A1172-74. Although Gray-Burriss was not personally the subject of the subpoena or compulsion order, Shaner aided in identifying documents to be produced, and the Government withdrew its motion for contempt when Gray-Burriss represented that he had produced all responsive documents. A1203-04; A1208-09.

Edward Sussman was appointed additional CJA counsel in April 2012. A14. Both sides reported on June 20, 2012 that the parties would be ready for trial on November 2, 2012. A45.

7

### 3.    Christmas Arrives Unprepared

On July 27, 2012, Patrick Christmas entered his appearance as retained counsel for Gray-Burriss. A46. He moved to continue the trial based on two criminal trials already scheduled for November 2. A47-48. The District Court denied the continuance and allowed Sussman to withdraw as second counsel. A17.

On August 16, 2012, the Government filed the 19-count Second Superseding Indictment, upon which Gray-Burriss was tried. A49-87. One week later, Shaner moved to withdraw, stating that Gray-Burriss "is satisfied with his retained counsel and does not oppose this Motion to Withdraw," and that she had transferred her files to Christmas. A88. The District Court denied that motion, citing the need for "prepared counsel" for the November 2 trial. A234. The District Court set a September 4 motions deadline. A219; A234-35. It denied Christmas' oral request that the trial be postponed because of the Second Superseding Indictment. A17; A218, A224-32. The Government formally withdrew its plea offer of 36 months. A223.

The motions deadline passed without any new defense motions. A237-38. Thereafter, the parties and the District Court agreed that the defense would identify experts by September 15, 2012. A241-42. The District Court reminded counsel that defense objections to the Government's proposed voir dire, jury instructions and proposed verdict form were due October 17 and that the parties "must confer and

8

make a joint submission, filing and submission to chambers by October 24th of those pre-trial materials." A240. Also by October 24, each side needed to "submit an exhibit list and witness list to the Clerk and to Chambers." A40. The Government complied with those deadlines, but defense counsel missed all of them. A19.

On September 27, 2012, the Government filed a motion in limine to bar any expert testimony, based on the defense's failure to designate any expert by the deadline. A90-93. The motion was granted as unopposed. A96-99.

On October 24, rather than file the materials due that day, Christmas again moved to continue the trial date. A94-95. Incredibly from an ethics standpoint, Christmas asserted that, to meet the November 2, 2012 trial date, had had "'resolv[ed]' the two trial matters (not to the full pleasure of his two clients)" scheduled for that same day. A94. Christmas represented that he was unprepared to go to trial, and that "a serious injustice will occur if Defendant is 'forced' to trial on November 2, 2012." A95. The District Court denied the continuance:

> [I]t may be understandable that Christmas may not feel fully prepared to conduct the trial on the current date set, given the recency (July 27, 2012) of his appearance in the case. Here, though, that poses no basis for a continuance. [Shaner] still represents him. This past June before Christmas entered his appearance, Shaner and the government announced that there were no impediments to trial-readiness by all parties. The defendant is represented by able, experienced CJA counsel who has been on the case throughout. He has the benefit of two experienced counsel, not just Christmas. They can be expected to

9

adjust trial responsibilities to achieve the zealous and effective representation to which the defendant is entitled.

A110.

### 4. Defense Counsel Is Ordered to Show Cause for Their Defaults

Nine days before trial, the Government informed the District Court of the defense's failure to comply with the pretrial order. A111-12. The only response to the Government's emails offering to meet was a voicemail from Shaner "that Mr. Christmas is lead counsel and that she had not heard from him." A112.

Eight days before trial, the District Court

ORDERED that [Shaner and Christmas] show cause in writing by October 30, 2012 at 4 p.m. why sanctions should not be imposed upon each of them for violating the Court's Pretrial Order, why a complaint should not be filed against each of them with this Court's Grievance Committee for violating the Court's Pretrial Order, and why referrals to the D.C. Bar or other actions against each of them should not proceed for failing to comply with Court-ordered obligations for which each of them is individually and fully responsible.

A114-15.

This threat of sanctions "terrified" Shaner. A1049. She responded:

18 … [Christmas] made inaccurate statements about [Shaner's] trial preparations when she was lead counsel.

19. As of the morning of October 24, [Shaner] had not been not included by [Christmas] in any strategic legal decisions, consulted about his defense themes and theories by [Christmas], or consulted about his plans for Voir Dire, jury instructions, witness lists, exhibits, or anything relating to a potential meet-and-confer with government counsel….

10

20. Around noon on October 24 – shortly after [Shaner] returned to Washington D.C. from an out-of-town trip – [Shaner] spoke to [Christmas] about the upcoming filing deadline, and [Christmas] authorized [Shaner], without providing any guidance whatever, to meet with [Government counsel] Falvo.

21. When [Shaner] notified government Counsel Falvo of her availability to meet with him, Falvo stated he would not now meet as he had his "marching orders".

22. [Shaner] has done everything reasonably possible within the scope of her authority to assist [Christmas] in complying with the Pretrial Order of the Court. [Shaner] does not have the legal or ethical right under the Sixth Amendment and the Rules of Professional Responsibility to usurp the role of attorney Christmas, who is retained lead counsel of choice of the defendant.

[Shaner] has retained counsel, Hank Asbill and Jennifer Lichter of the law firm Jones Day, to represent her in this very serious matter. Should the Court not vacate the Order to Show Cause, [Shaner] requests a Hearing with her attorneys present. [Shaner] also requests a clarification of what "sanctions" or "other actions" mean, to permit her retained counsel to prepare for the Hearing.

A118-19.

Late as usual, Christmas responded on October 31. A121-24. The fault for scheduling violations "lie[d] entirely with [Christmas] and not [Shaner]." A121. Only upon seeing the Government's documents did Christmas "beg[in] to appreciate the complexity of preparing a professional and proper defense in this matter." A122. He detailed his outlandishly busy court schedule from October 19 to 30. A122-23. His omissions were "certainly not due to inexcusable nonfeasance, but rather due to a literally overwhelmed trial counsel during the months of September and October 2012." A124. Christmas "had hoped to submit proposed

11

jury instructions before the beginning of the second week of trial." A124. That same day, Christmas filed proposed voir dire and jury instructions, but not an exhibit list or witness list. A19.

### 5. The District Court Refuses to Address the Show-Cause Order Until After Trial

The day before trial, two Jones Day attorneys moved for leave to appear on behalf of Shaner. A19. On the morning of jury selection, Shaner pleaded for leave to withdraw because she was "too upset to go forward with my license, my liberty, my reputation and my livelihood pending, and I am afraid that it will have prejudicial effects on my zealous advocacy and on [Gray-Burriss]." A246.

The District Court refused to take up the matter at that time, instead deferring the hearing until the conclusion of trial. A246-47. It entered a paperless order:

> [A]s court convened to select a trial jury, [Shaner] asked for an immediate hearing on the show cause order issued on October 25, 2012. Two counsel whom she has retained to represent her in connection with the order were present to conduct the hearing. She asserted that the existence of the unresolved show cause order threatened her professional license and ability to earn a livelihood, and would distract her from being able to provide zealous and effective representation to her client in the trial. This court has seen Ms. Shaner under fire before, and she has held her own like the experienced professional that she is. The court was fully confident that she would not falter in her duty to her client. That confidence has been borne out thus far by her usual skilled advocacy during the full day of voir dire that has been completed. Her motion was denied so as not to delay the panel of 65 prospective jurors waiting in the jury office who had been pre-screened and summoned specially for this

trial, and to bring no further delay to a trial that had been delayed far too long already …. Accordingly, it is hereby ORDERED that a hearing on the show cause order shall be scheduled after the conclusion of the trial.

A20. Voir dire did not involve any substantive matters. A248-75.

### 6.     Defense Counsel Bungle Their Way Through Trial

At trial, the involuntary partnership of Shaner & Christmas was as dysfunctional and disorganized as the responses to the show-cause order portended. Not until the third week of trial did Christmas follow through on repeated promises to provide an exhibit list and defense exhibits. A296; A310; A325; A329; A343; A346-47; A527-29; A539-40; A555; A679-80; A684-85, A742-43. Government counsel expressed it best when remarking, after a full week of trial, that "we have two [defense] lawyers who have not gone through the exhibits I gave them three weeks ago." A392.

That remark came during the examination of Government witness Michael Ashford, who served as NASPSO's president through February 2009. A377. Christmas received permission to leave the courtroom to attend to a matter in another courtroom. A382-83. When Christmas was late to return, the Government was surprised to hear that "Christmas is going to cross Mr. Ashford," as it had "been showing [Shaner] the exhibits and answering her objections." A397. Christmas was absent for the final 20 transcript pages of Ashford's direct examination. A398-418. A breathless Christmas then returned and began cross-

13

examining Ashford without pausing even to ask Shaner what Ashford had testified to. A419.

At trial, the District Court barred exculpatory defense exhibits as a sanction for failure to produce documents in accordance with subpoenas. A695-97; A764-65; A836-37; A848-50. Halfway through trial, the defense first realized that Government Exhibit 105C, Gray-Burriss' July 2009 employment agreement, was unsigned. A477; A558; A1159-63. Shaner admitted she'd had the signed agreement since January 2011, and that it was her fault the document was not produced. A557-58, A659. A third-party inquiry verified that the document was authentic. A639-41. Although taking defense counsel's "word as an officer of the court, that any such violation was not willful," A543, the District Court expressed its belief that exclusion was appropriate if the defense could not establish "good cause." A539-40, A543, A546, A548.

Fifteen minutes before closing argument, Shaner, citing the loss of her voice, handed closing argument off to Christmas. A993-94. Hours later, however, she regained her voice to defend herself against sanctions. A1040-50.

### 7. Both Defense Attorneys Confess to Gross Malpractice

Once the jury retired for deliberations, Christmas asked: "[T]here's been a matter before Your Honor which has chilled my representation and that of Ms. Shaner and when might we have a hearing on that?" A1033. In the course of that

14

hearing, Christmas repeatedly confessed to gross malpractice. He thought the pretrial deadlines were advisory, and he expected no consequences for missing them. A1035-1040.

Shaner pleaded that, because Christmas shut her out of trial preparations, she didn't realize the magnitude of Christmas' failings. A1040-50. The District Court referred Shaner to the many times it announced its expectation that Shaner would fully participate in the defense. A1042, A1050.

When Christmas admitted to bullying Shaner, the District Court cut him off: "I'm not sure that revealing that strategy is going to help anybody at any time, anywhere, and I hope it doesn't have to go beyond this courtroom." A1051. It discharged the show cause order as to both Christmas and Shaner, *id.* at A1051-52, and told them how easily they could have avoided the problem:

> I would expect when I issue orders for people to do something, if they can't do it, just tell me, rather than not say anything or rather than let *some other party cast the nonperformance in a light that raises all kinds of concerns and hackles which would, as far as I am concerned, understandably prompted in me a reaction of distress*, I'll put it that way. But to not do anything, I think was the big mistake here. To not say anything was the big mistake here. I think if you look over the record of this proceeding alone, not even other ones that Ms. Shaner and I have worked on before, where there have been reasonable requests for accommodations, I usually make them.

A1052 (emphasis added).

15

### 8.   The Jury's Special Verdict Reveals Its Acceptance of False Facts

The jury acquitted Gray-Burriss on Count 16, but it convicted him on the remaining counts. A125-44. Its special verdict did reject many of the Government's proposed findings, but the jury unmistakably accepted the Government's assertion that certain salary payments—for which the District Court had excluded documentation as a discovery sanction—were unauthorized and fraudulent. A128-31, A140-41; *see infra* § I.C-D.

### 9.   The District Court, Somehow Finding No Deficiencies in Counsel, Sentences Gray-Burriss

The District Court denied Gray-Burriss leave to file *pro se* motions asserting ineffective assistance of counsel. A24. Shaner moved for judgment of acquittal and for a new trial. A148. She attached the list of defense exhibits, two key excluded exhibits, and one of the *pro se* ineffective assistance motions. A158-71.

The District Court denied the post-verdict motions at the start of the sentencing hearing. A1058-64. It reiterated that the case had been pending too long to delay trial based on counsel's unpreparedness. On the discovery sanctions, it only saw an issue of whether there was good cause for the violation: "[Defendant] does not contest, though, that he violated his discovery obligation and makes no showing that the preclusion order was error." A1064. Despite Shaner's representations that she yielded full control over the defense to Christmas, the

16

Court found that Shaner (not Christmas) provided effective counsel, that the evidence was "substantial," and that Gray-Burriss had not contested certain of the misdemeanor counts. A1064.

The two sides agreed to use the special verdict findings to calculate loss amount, restitution, and forfeiture. A1067-69; A145-47. Gray-Burriss was sentenced to 76 months' imprisonment, plus restitution and forfeiture of $252,276.38. A202-09; A211-13; A1076-77.

## SUMMARY OF ARGUMENT

The District Court abuses its discretion where, as here, it applies the wrong legal standard. It excluded key defense evidence as a sanction for failing to produce it in response to a subpoena, even though exclusion is not an authorized remedy under Rule 17. The District Court similarly misunderstood the analysis for discovery sanctions under Rule 16, erroneously holding that exclusion was necessary if the defense failed to show "good cause" for the disclosure. Nor could a proper "least severe sanction" analysis have led to exclusion. The record reflected, and the District Court held, that the nondisclosure resulted from counsel's negligence and was not willful. Exclusion of the signed 2009 employment agreement allowed the jury to concluded that the document, which was concededly authentic, did not exist. Within the Government's theory of the

17

case, the defense's inability to produce key documents was damning evidence of fraudulent intent as to all counts.

Gray-Burriss also establishes two distinct claims of ineffective assistance of counsel, each of which is clear from the record or at least warrants a remand for a hearing. First, as defense counsel themselves expressed at trial, they were laboring under a conflict of interest that chilled their representation. The District Court's show-cause order preoccupied them throughout trial—culminating in an unprepared Christmas presenting closing argument when Shaner allegedly lost her voice, only for Shaner to regain that voice hours later to defend herself against the show-cause order. That adverse impact on the defense is alone sufficient to warrant retrial. Second, the record establishes a pattern of gross malpractice that prejudiced the defense. This Court should reverse or remand.

## ARGUMENT

## I.    DISCOVERY SANCTIONS

### A.    <u>Standard of Review</u>

This Court reviews the ruling excluding the defense evidence for an abuse of discretion. *United States v. Marshall*, 132 F.3d 63, 69-70 (D.C. Cir. 1998). "A district court by definition abuses its discretion when it makes an error of law," *Koon v. United States*, 518 U.S. 81, 100 (1996), including when it applies an

incorrect legal standard. *Kickapoo Tribe v. Babbitt*, 43 F.3d 1491, 1497 (D.C. Cir. 1995).

To preserve error, a defendant need only "inform the court and opposing counsel of the ruling he wants the court to make and the ground for so doing; he need not cite the particular case that supports his position." *United States v. Rashad*, 396 F.3d 398, 401 (D.C. Cir. 2005); *see* Fed. R. Crim. P. 51.

### B.    Applicable Law

Consistent with the general rule nationwide, 9A Fed. Proc., L. Ed. § 22:1178, Circuit law sets forth the following framework for Rule 16 sanctions:

> The district court has wide discretion in imposing a sanction if it finds that Rule 16 has been violated. The court may grant a continuance; prohibit the violating party from introducing the evidence at issue; or "enter such other order as it deems just under the circumstances." Fed. R. Crim. P. 16(d)(2). A trial judge should impose "the least severe sanction that will accomplish the desired result—prompt and full compliance with the court's discovery orders."

*United States v. Marshall*, 132 F.3d 63, 69-70 (D.C. Cir. 1998) (quoting *United States v. Sarcinelli*, 667 F.2d 5, 7 (5th Cir. 1982)).[1]

"Ordinarily, a continuance is the preferred sanction for a discovery delay because it gives the [other side] time to alleviate any prejudice it may have

---

[1] Although *Marshall* apparently conflicts with *United States v. Day*, 524 F.3d 1361, 1372 (D.C. Cir. 2008), which rejected a least-restrictive-alternative analysis, the earlier decision in *Marshall* controls. *See United States v. Old Dominion Boat Club*, 630 F.3d 1039, 1045 (D.C. Cir. 2011); *United States v. Tann*, 532 F.3d 868, 875 n.* (D.C. Cir. 2008) (earlier precedent controlled over *Day* on different issue). Neither the briefs in *Day* nor the opinion in *Day* cited *Marshall*.

19

suffered from the late disclosure." *Marshall*, 132 F.3d at 70. This preference applies even where the discovery violation comes to light mid-trial, requiring a mid-trial adjournment. *Id.* at 66, 70. Notwithstanding the District Court's discretion to exclude evidence in an appropriate case, "such a severe sanction would seldom be appropriate where … the trial court finds that the [party's] violation did not result from its bad faith and that a less drastic remedy (such as a continuance) will mitigate any unfair prejudice." *Id.* at 70.

**C.**    **Exclusion of the Executed July 1, 2009 Employment Agreement**

Gray-Burriss will focus on the exclusion that most obviously prejudiced his defense: Defense Exhibit 5, the executed July 2009 employment agreement.[2] A160-64.

**1.**    **The 2009 Agreement, If Genuine, Is Valid Under the Government's Theory of the Case**

Count Eight charged Gray-Burriss with embezzlement through unauthorized salary and bonus payments. A57-61. The Government contended that Gray-Burris' 2009 employment agreement, even if genuine, was invalid. A181. When Tresvant and Tyree each testified to signing the 2009 salary agreement, the Government cross-examined them with provisions of NASPO's constitution giving the "National Executive Board"—defined as the "National President, the National

---

[2] The defense alternatively referred to the agreement as Exhibit 3-D and as Exhibit 5. A636; A837. This brief refers to the agreement as Exhibit 5, per the final exhibit list. A158.

Secretary-Treasurer, 2 National Vice Presidents, the National Recording Secretary, and the National Director of Organizing," A1126-27—the responsibility to set and change the salary for the president and secretary-treasurer. A1128-33; A768-69' A777-80; A836-40; A967-71. The Government cited those same provisions when objecting to the use of the 2009 agreement to refresh Gibbs' recollection when she couldn't remember whether she signed it. A653; A694-97; A699-701.

This argument contradicts the Government's concession of the validity of Gray-Burriss' 2011 employment agreement. The Government elicited the following testimony

> **Q** … As part of your investigation, did you regard this April contract dated April 1st, 2011 as authorizing to Mr. Gray-Burriss the payments listed therein?
>
> **A.** Yes ….
>
> **Q.** Based on your investigation, did you regard the payments in this agreement as authorized by the union based upon the agreement itself?
>
> **A.** Yes.
>
> **Q.** … Is there anything in this agreement, April 1st, 2011, that appears in the indictment as a charged transaction?
>
> **A.** No, we considered this authorized.

A514-16; A1175-79. But none of the individuals signing the 2011 agreement for NASPSO were within the definition of "National Executive Board." A1179.

In fact, NASPSO never followed the requirement that the properly constituted Executive Board approve any changes in salary:

| Year | Annual Salary | Signing for NASPSO | | Gov't Concedes Validity? A505-16 |
| | | Name/Position | Exec. Bd. Members, per Const. | |
|---|---|---|---|---|
| 2004 A1087-90 | $60,000 | Goodman / VP & General Counsel | 1 | Yes |
| 2006 A1091-95 | $40,000 | Ashford / President<br>Tyree / Local President<br>Amour / Local VP<br>Perry / Local President<br>(Gray) Munford / Local VP<br>McRae / Local President<br>Withers / Local VP | 1 | Yes |
| 2007 A1096-1100 | $55,000 | Ashford / President<br>Amour / Local VP<br>Perry / Local President<br>McRae / Local President<br>(Gray) Munford, Local VP | 1 | Yes |
| 2009 A160-64 | $70,000 | Tresvant / Dir. of Human Rights<br>Cuppitt / position not indicated<br>Gibbs / Local VP<br>Tyree / Local President | 0 | No |
| 2011 A1175-79 | $98,500 | Tresvant / Local VP & Dir. of Human Rights<br>Tyree / Local President<br>Gibbs / Local VP<br>Jones-Richardson / Shop-Steward | 0 | Yes |

The Government cited testimony that Munford did not recall post-2007 agreements. A181; A464. But that testimony does not change that the 2009 agreement is just as valid as the 2011 agreement. Under the Government's constitutional argument, the local presidents and vice presidents (like Munford in

22

2006 and 2007) had no business signing any of the employment agreements. The "executive board," from 2006 to 2011, was an assortment of remaining national officials and local officials. A722-35; A799-802 A819-20; A853-54. Most of the executive board positions were vacant. A370-76. In 2006, 2007, 2009, and 2011, the highest ranking national official[3] other than Gray-Burriss executed the agreement, along with miscellaneous local officials. With NASPSO leadership having dwindled before the October 2011 national elections, Jones-Richardson signed the April 2011 agreement in her capacity as a "shop-steward"—and still the Government concedes that agreement's validity. A1179.

Moreover, even if the Government offered a logically consistent distinction between the 2009 and 2011 agreements, the former's validity was at least a jury question. The Government elicited testimony from Munford that she sat on the Executive Board, A452-55, even though, under the Government's constitutional theory, she wasn't a member. Munford's responses, when asked whether the Executive Board approved any pay increases after July 2007, were equivocal: "Not to my knowledge .... Not that I'm aware of." A464. Her grasp of the chronology was tenuous. She recalled a post-June 2007 request for a raise, but she was "not exactly sure when." A464. She did not recognize a 2008 memorandum from Gray-

---

[3] Though NASPSO's constitution did not mention a "Director of Human Rights," Tresvant was NASPSO's highest official after Ashford left in February 2009. A1194-95; A377.

Burriss requesting a raise. A467; A1158-59. Nor could she recognize or authenticate the blank version of the July 2009 agreement. A468; A1159-63. She did not remember if she was "ever asked to sign another employment agreement for the defendant." A468. She missed about half of all executive board meetings. A476. Only in the Government's argument at sidebar and in summation did Munford's equivocation transform into an authoritative, affirmative declaration that the Executive Board rejected the July 2009 agreement. A643-44; A967.

The Government would later would offer Ashford's testimony to intimate that the 2009 agreement was unauthorized. A181. But Ashford left NASPSO by February 2009. A396. Ashford's testimony was no more relevant to the July 2009 agreement than to the April 2011 agreement. Both agreements were equally valid.

### 2.    The Signed Agreement, Found in Paychex's Records, Was Indisputably Genuine

When Christmas first tried to use the 2009 agreement on November 13, the Government understandably doubted its authenticity. But then the defense emailed Paychex on November 14, and the next day Paychex located the executed 2009 agreement and emailed it to the defense. A556, A637-38, A642. The Government contacted Paychex for independent verification. A636-44. Paychex verified that its account manager retained the executed agreement in her personal file, that the agreement did not make its way into Paychex's official NASPSO file, and that Paychex therefore erroneously failed to produce the executed 2009 agreement

24

when it received a 2010 grand jury subpoena. A639-41. The document even had a facsimile header line of October 5, 2009. A160-64; A639. There is no dispute that the executed July 2009 agreement was genuine.

### 3.     The District Court Abused Its Discretion

The District Court abused its discretion by applying the wrong legal standard and imposing a sanction that thwarted the jury's search for the truth.

#### a.     Lack of Authority to Exclude Evidence as a Sanction for Noncompliance with Grand Jury Subpoenas

The exclusion of the executed 2009 agreement "was primarily as a result of Defendant's failure to provide it in response to several grand jury subpoenas, and not merely as a sanction under Rule 16." A180; *see* A696-97. Nowhere did the District Court or the Government cite authority for excluding evidence as a remedy for non-compliance with a subpoena or compulsion order.

The District Court issued the subpoenas under Rule 17. Ex. 108, Ex. 109. Contempt is the only remedy for disobedience. Fed. R. Civ. P. 17(g); *see* Fed. R. Crim. P. 42 (specifying procedures for contempt). "[C]riminal contempt is committed by one who, in response to a subpoena calling for corporation or association records, refuses to surrender them when they are in existence and within his control." *Nilva v. United States*, 352 U.S. 385, 392 (1957).

The only punishment for contempt is "fine or imprisonment, or both." 18 U.S.C. § 401; *see United States v. Sampogne*, 533 F.2d 766, 767 (2d Cir. 1976).

Exclusion of defense evidence at trial is not an authorized punishment. Because the Court had no authority to exclude evidence as punishment for violating the subpoenas, it necessarily abused its discretion. *Supra* § I.A.

### b.      Application of Wrong Rule 16 Analysis

Even under Rule 16, the District Court applied the wrong legal analysis. Although accepting that the discovery failures were unintentional, A543, the District Court repeatedly expressed that exclusion was necessary if the defense could not establish "good cause." A539-40; A543; A546; A548. "Good cause" is the standard for a defendant who fails to timely disclose certain affirmative defenses: alibi, insanity, or public authority. Fed. R. Crim. P. 12.1(d), 12.2(a), 12.3(a)(5). Exclusion is the only remedy for violating those rules. Fed. R. Crim. P. 12.1(e), 12.2(d), 12.3(e).

Different standards govern the general discovery requirements of Rule 16. *See* A496 (pointing out different standards). "Good cause" is the standard for protective orders, Fed. R. Civ. P. 16(d)(1), not the standard for excusing discovery failures. Rather, Rule 16(d)(2) gives the District Court wide discretion to fashion remedies short of exclusion. Circuit law requires the District Court, in considering potential sanctions, to impose "the least severe sanction that will accomplish the desired result—prompt and full compliance with the court's discovery orders." *Marshall*, 132 F.3d at 69-70. Even where evidence arises mid-trial, the District

26

Court must consider the availability of a mid-trial continuance before imposing the draconian remedy of exclusion. *Id.* at 66, 70. By instead applying an erroneous analysis under which undisclosed evidence would be excluded unless the defense showed "good cause," the District Court necessarily abused its discretion under Rule 16. *Supra* § I.A.

### c.     Undue Severity of Sanction

Even had the District Court applied the *Marshall* analysis, that analysis could not have supported exclusion of the executed 2009 agreement.

*Availability of a Continuance:* A "continuance is the preferred sanction for a discovery delay because it gives the [other side] time to alleviate any prejudice it may have suffered from the late disclosure." *Marshall*, 132 F.3d at 70. In *Marshall*, this Court found that a "long weekend" between the proffer of undisclosed evidence and the ruling admitting the evidence, *id.* at 66, alleviated any prejudice because the other side "received what amounted to a four-day continuance to ponder how it would confront that evidence." *Id.* at 70.

Here the Government used the long weekend after Thursday, November 15 to verify with Paychex that the 2009 agreement was authentic. A556; A635-47. The Government was still one week away from resting its case, and it still had plenty of time to prepare a rebuttal case if it wanted to call or re-call any witnesses to account for the agreement.

27

*Lack of Bad Faith*: The "severe sanction" of exclusion is "seldom appropriate" absent an express finding of "bad faith." *Marshall*, 132 F.3d at 70. Here, the District Court accepted that the "violation was not willful, wasn't intentional." A543. The evidence in fact supported that finding. As of January 10, 2011, Shaner was reviewing documents to determine whether to disclose them in response to the subpoena. A1203-04. Shaner first saw the executed 2009 agreement among two bags of documents she received on January 9 or 10, 2011. A557-58; A659. She did not realize her failure to disclose the document until the issue first arose at trial. A477; A558.

It makes no sense that Gray-Burriss would have intentionally withheld the document. The September 2010 subpoena was captioned "IN RE: POSSIBLE VIOLATION OF 29 USC 501(C)," and requested Gray-Burriss' entire personnel file and all documents regarding his compensation from April 2007 onward. A1164-71. Obviously, the Government was investigating whether Gray-Burriss received unauthorized compensation. The executed July 2009 agreement was the only documentation for authorization of his raise.

There was also no reason for Gray-Burriss to have believed that any concealment would be successful, since by all rights the 2009 agreement should have been among the documents produced by Paychex. The fact that Paychex also failed to produce the document—as would have cured any prejudice—drives home

that only a perfect storm of negligence prevented the Government from receiving the document in advance of trial.

*Lack of Prejudice to the Government:* The District Court asked the Government to articulate how introduction of the 2009 agreement would prejudice its case. A670-74. The District Court rejected the Government's convoluted theory of prejudice. A670 (referencing A531-35). Ultimately, Government counsel conceded that "[p]erhaps the government's objection is more of an intellectual one …. [because] it feels like that the defendant is being rewarded for violating the Court orders by being permitted to do that, and I probably should let that go." A674. Yet that intellectual objection carried the day.

*The Truth:* Exclusion is "particularly inappropriate" if it threatens to "subvert[] one of Rule 16's goals: 'contributing to an accurate determination of the issue of guilt or innocence.'" *Marshall*, 132 F.3d at 70 (quoting Fed. R. Crim. P. 16, advisory committee note to 1974 amendment). Thus, *Mitchell* found that Rule 16 could not justify excluding evidence disproving a demonstrably false statement. *Id.* Courts should be wary of "exclud[ing] truth in the search for truth in the administration of justice." *Nix v. Williams*, 467 U.S. 431, 445 (1984).

By the time the District Court definitively ruled that the defense could not use the 2009 agreement for any purpose, A694-97, Paychex had verified its authenticity. The District Court's sanction was so far in derogation of the truth that,

when Wanda Gibbs could not recall whether she signed the 2009 agreement, Gray-Burriss was not allowed to refresh her recollection by showing her the agreement with her signature. *Id.* Such a purpose does not even require the document to be identified or admitted into evidence, and a witness can refresh her recollection outside the jury's presence. *See* Fed. R. Evid. 612. Still, however, the District Court allowed the jury to believe the document didn't exist.

### D.    Exclusion of Fraser's Signed Employment Agreement

For the same reasons, the District Court also excluded Defense Exhibit 17, a signed employment agreement, dated October 15, 2011, for union organizer Gaby Fraser. A165-67; A764-65; A846-50. Numerous members of the executive board (by then duly constituted) testified to signing the contract. A781-82; A846. But the Government successful objected to the jury seeing it.

Count Twelve charged Gray-Burriss with embezzlement through unauthorized payments to Fraser totaling $43,374.99, which the Government contended were entirely unauthorized. A72-73. These allegations differed from the allegations as to Gray-Burriss' salary, which the Government contended was only partially unauthorized. A57-61. The jury found that the entire $43,374.99 paid to Fraser constituted embezzlement. A140-41.

This finding did not make sense if—as everyone agreed—the document was both genuine and valid. Under the agreement, Fraser was entitled to be paid for *at*

*least* 20 hours per week at $45 per hour, with a cap of 40 hours per week. A165. Deducting that minimum $900 per week for the 30-week period covered by Count Twelve, therefore, Gray-Burriss could not possibly be held to have embezzled more than $16,374.99.

The Government did not contest the document's authenticity, indeed going so far as to use it to refresh a witness' recollection. A781-82. Rather, the Government shifted to arguing that Gray-Burriss deceived the union by unilaterally signing a rider shifting Fraser to a $70,200 per year salary two weeks after the executive board approved the hourly salary. A167. The District Court acknowledged that the move potentially saved NASPSO money, since the hourly contract allowed Fraser to earn up to $93,600 per year. A185-87. But it held the evidence sufficient for the jury to find that Fraser was not working enough hours for the switch to save NASPSO money, and to find that Gray-Burriss hid the change from the executive board. A186-87.

There are two major problems with this conclusion. First, Gray-Burriss, as president in October 2011, had the authority to unilaterally "employ and discharge" employees like Fraser. A1129. More importantly, after the Government originally challenged the existence of the agreement, A703, multiple witnesses testified to signing an agreement the jury was not allowed to see. The Government

31

asked the jury to assume the worst whenever the defense cited a document but could not produce it. *Infra* § I.E; A943-44.

The jury in fact saw the evidence in the worst light, finding all payments entirely fraudulent. On this nuanced issue, the jury certainly should have seen the controlling documents. But the District Court excluded Defense Exhibit 17 for the same reason it excluded Defense Exhibit 5—because it was not produced in response to a subpoena and compulsion order. A849-50. That rationale does not make sense. The October 15, 2011 agreement was not in existence at the time of the March 2011 show-cause hearing. A1207-10. It was responsive only to a 2012 subpoena and compulsion order, which were directed only to NASPSO, and as to which Gray-Burriss made no representations to the District Court. A710-15; A1183-88. But, in any event, exclusion is not a remedy under Rule 17. *Supra* § I.C.3.a. Nor did the District Court make any of the findings necessary to justify the severe sanction of exclusion under Rule 16. *Supra* § I.C.3.b-c. The District Court thus abused its discretion.

### E.    <u>Prejudice</u>

The "Government bears the burden of proving harmlessness." *United States v. Palmera Pineda*, 592 F.3d 199, 201 (D.C. Cir. 2010). The Court may not disregard error simply because the "evidence of … guilt, even without the [disputed evidence], was substantial and might very well have caused the jury to

bring in a verdict of guilty." *Leigh v. United States*, 308 F.2d 345, 346 (D.C. Cir. 1962). The inquiry is "'whether the error itself had substantial influence. If so, or if one is left in grave doubt, the conviction cannot stand.'" *Id.* (quoting *Kotteakos v. United States*, 328 U.S. 750, 765 (1946)).

Certainly, the error was not harmless regarding the jury's findings at Count 8 that Gray-Burriss embezzled unauthorized salary payments beginning July 1, 2009, A128-31, or regarding the findings on Count 12. Vacating those findings would, at a minimum, diminish Gray-Burriss' forfeiture and restitution obligation, a matter of no small concern to him. Moreover, those findings (including Count 12 alone) increased Gray-Burriss' sentencing calculation by two points, pushing the loss over $200,000. U.S. Sentencing Guidelines Manual § 2B1.1(b)(1)(F)-(G).

More importantly, the error infected all adverse findings on all counts. Gray-Burris' across-the-board defense was that he made honest mistakes, resulting from chronic understaffing and disorganization. A935-37; A1000. The Government stressed its overarching across-all-counts theme at the outset of its closing argument:

> Mr. Gray-Burriss used the union treasury as a vehicle to line his pockets unlawfully, to get money that was unauthorized, money that he simply wished to take from the union treasury.
>
> Now, there's nothing more elegant or sophisticated going on here. This is not an elaborate scheme or something that's difficult to figure out, take some sort of advance knowledge. ***What Mr. Gray-Burriss does is show people one piece of the puzzle, not the whole picture.***

33

> ***He'll propose a pension plan, but he won't show you the trust agreement***; give you a flyer that says you have benefits, but doesn't tell you where they are or how you can get them or whether they're being – how much you have in your pension plan. ***He'll show you a check request form, but not the receipts. He'll show you a check, but not the bill that's supposed to come with it.*** In each respect, Mr. Gray-Burriss just showed the members of that union, the officers of that union, the United States Government just a piece of the puzzle, not the whole picture.
>
> And there was one piece of the puzzle that Mr. Gray-Burriss wouldn't show anyone, wouldn't show anyone, and that is the bank records from the Amalgamated Bank and the Harbor Bank for the pension plan. We heard testimony, wouldn't show Wanda Gibbs who was the secretary/treasurer of the union, wouldn't show Mr. Tresvant, wouldn't show April Richardson. ***Mr. Tyree and Mr. Ashford actually asked him when he asked for a raise, well, what about the records?*** How much money do we have? They didn't see them. That's the one piece of the puzzle Mr. Burriss kept in his house and would not show anyone. ***Those bank records were not returned with the subpoena,*** but once that missing piece is shown, a seventh grader with a knowledge of a checking account can figure it out because they can say, look, cash, debit card, checks to oneself. With that missing piece, there's nothing sophisticated going on here, it's just a theft from the union.

A942-44 (emphasis added). Only thereafter did the Government "talk about the specific charges." A944.

Within the Government's narrative, Gray-Burriss' inability to produce his 2009 agreement and Fraser's 2011 agreement—even as witnesses testified as to their existence—were damning omissions before the jury. Those omissions reinforced the central theme that he "show[s] people one piece of the puzzle, not the whole picture," including that "[h]e'll propose a pension plan, but he won't

show you the trust agreement." A943. Tresvant and Tyree, whom the Government

portrayed as Gray-Burriss' toadies, A975, testified to signing the agreement, but

the 2009 agreement was a key document the defense couldn't produce. The

Government inched as close as it could to the 2009 agreement:

> We go to July 2009. Mr. Gray-Burriss approaches [Munford]. She
> said he approached me in my guard shack and asked me to sign
> something, and I told him no, I'm not going to sign an increase for
> you. I don't know what the records of this organization are. But Mr.
> Gray-Burriss, failing to get approval from the Executive Board, does
> the same thing [unilaterally increasing his salary] all over again.

A967. Of course, Munford had no idea when Gray-Burriss approached her, and she

couldn't recall being asked to sign the July 2009 agreement. A464; A467-68.

Within the Government's theory of the case, the jury's findings of

embezzlement on Counts Eight and Twelve necessarily undermined Gray-Burriss'

good-faith defense across all counts. *See generally United States v. Rooney*, 37

F.3d 847, 855-57 (2d Cir. 1994) (collecting cases). The Government's case was not

overwhelming, as it failed to persuade the jury on Count 16, on many of the

alleged instances of embezzlement, and on most of the alleged overt acts of

conspiracy. A127; A134-39; A141-42. The concededly genuine 2009 agreement in

particular would have been powerful evidence of innocence on the remaining

charges.

Again, at the core of the Government's case for fraudulent intent were the

bank records, which Gray-Burriss "kept in his house and would not show anyone,"

35

and which "were not returned with the subpoena." A943-44. From there, the jury accepted the Government's theory that missing records indicated that Gray-Burriss intentionally destroyed incriminating documents. A142. The executed 2009 agreement—an exculpatory document that Gray-Burriss had no reason to conceal[4]— gave strong grounds to infer a more innocent explanation as to all gaps in documentation. Chronic disorganization, not felonious intent, caused his failure to produce documents. Within the chaos of his files, Gray-Burriss and his counsel had no idea what documents Gray-Burriss did or did not retain, or which documents the defense had or had not produced to the Government.

It's not Gray-Burriss' burden to identify the precise tipping point at which the defense, by removing pieces of the Government's case, would have caused any given adverse finding, any given count, or the Government's entire case to topple like a Jenga tower. Rather, there certainly is at least grave doubt whether the excluded evidence substantially influenced the other convictions. *Palmera Pineda*, 592 F.3d at 201.

---

[4] The Government insisted it was inculpatory because of a cover letter to Paychex stating that the executive board had approved the salary increase. This argument overlooked that NASPSO and Gray-Burriss never strictly followed the NASPSO constitution—not even for the concededly valid 2004, 2006, 2007, and 2011 employment agreements—with the executive board consisting of a collection of local and national officials. *Supra* § I.C.1.

36

At only one point in denying Gray-Burriss' motion for new trial did the District Court address the matter of prejudice. Regarding the *pro se Strickland* motion, the Court noted the "substantial" case as to the felony counts, and Gray-Burriss' failure to meaningfully contest certain misdemeanor counts. A1064. Even on that theory, Gray-Burriss is serving only 12 months' imprisonment for the misdemeanors, and vacating the felony convictions would require a recalculation of restitution and forfeiture. Given the Government's overarching theory of the case, it cannot sustain its burden, particularly not on the felony convictions. This Court should reverse the judgment below.

## II.    INEFFECTIVE ASSISTANCE

### A.     <u>Standard of Review</u>

Circuit law permits claims of ineffective assistance of counsel to be raised on direct appeal. "In this Circuit, we generally remand 'colorable claim[s]' of ineffective assistance to the district court to make any necessary factual findings," *United States v. Pole*, __ F.3d __, 2013 WL 6697884 (D.C. Cir. Dec. 20, 2013) (quoting *United States v. Moore,* 651 F.3d 30, 85, 87 (D.C. Cir. 2011)), "unless the record conclusively demonstrates that the defendant is or is not entitled to relief." *Id.* (quoting *United States v. Fareri,* 712 F.3d 593, 595 (D.C. Cir. 2013)) (remanding claim); *see United States v. Hylton*, 294 F.3d 130, 136 (D.C. Cir. 2002) (ordering new trial where record established entitlement to relief).

37

The District Court declined to entertain the *pro se Strickland* motion, instead making the findings discussed in Section I.E "even if it were entertained." A1064. Given that the District Court was not fully considering Gray-Burriss' *Strickland* claim, while Gray-Burris was still represented by his ineffective trial counsel, it is not clear that the "clearly erroneous" standard of review for ineffective-assistance claims should apply here. *United States v. Mathis*, 503 F.3d 150, 151 (D.C. Cir. 2007). In any event, the District Court failed to properly consider the separate conflict-of-interest claim (*infra* § II.B), and any factual findings on the *Strickland* claim were clearly erroneous (*infra* § II.C). The record conclusively establishes that Gray-Burriss is entitled to a new trial or at least a remand for a hearing.

### B.    Conflict of Interest

#### 1.    The Record Plainly Shows that Personal Conflicts of Interest Disabled Defense Counsel

Although the more familiar ineffective-assistance claim is under *Strickland v. Washington*, 466 U.S. 668 (1984), the Supreme Court has recognized a different type of ineffective-assistance claim for "a defendant who shows that a conflict of interest adversely affected the adequacy of his representation." *Cuyler v. Sullivan*, 446 U.S. 335, 349-50 (1980). Such a claim requires no showing of prejudice because "prejudice is presumed" if a conflict adversely affects counsel's performance. *United States v. Gannt*, 140 F.3d 249, 254 (D.C. Cir. 1998). A defense attorney has an "actual conflict" when the attorney is "required to make a

38

choice advancing [the attorney's] own interests to the detriment of [the] client's interest." *United States v. Bruce*, 89 F.3d 886, 893 (D.C. Cir. 1996).

To demonstrate that an attorney suffered from an actual conflict, a defendant must establish that there is more than a "mere theoretical division of loyalties." *Mickens v. Taylor*, 535 U.S. 162, 171 (2002). A defendant must show more than the mere possibility of a contempt citation "[b]ecause all attorneys potentially face contempt citations." *United States v. Taylor*, 139 F.3d 924, 931 (D.C. Cir. 1998). Instead, to succeed on such a claim, one must show that the court's threat was sufficiently serious. *See United States v. Shark*, 51 F.3d 1072, 1076 (D.C. Cir. 1995) ("[A]ny rebuke sufficient to create a cognizable conflict of interest would … hamper counsel's zealous representation as to violate a defendant's right to a fair trial."); *see also Armienti v. United States*, 234 F.3d 820, 825 (2d Cir. 2000) (defense attorney's interest in defending against an ongoing criminal investigation was sufficient to give rise to a conflict of interest).

## 2.   The Record Plainly Shows that Defense Counsel Faced Disabling Personal Conflicts of Interest

Such a conflict was created below when, eight days before trial, the District Court ordered that

> H. Heather Shaner, Esq., and Patrick J. Christmas, Esq., show cause in writing … why sanctions should not be imposed upon each of them for violating the Court's Pretrial Order, why a complaint should not be filed against each of them with this Court's Grievance Committee for violating the Court's Pretrial Order, and why referrals to the D.C. Bar

or other actions against each of them should not proceed for failing to comply with Court-ordered obligations for which each of them is individually and fully responsible."

A114-15.

Defense counsel each expressed a personal conflict of interest. Before the jury selection began, Shaner sought to withdraw from the case:

> MS. SHANER: Your Honor, I want to speak briefly to the serious life changing order hanging over my head during trial
>
> THE COURT: Ms. Shaner, I told you I'm going to address that matter, not today. We are here to pick a jury. I'm not going to address that matter today.
>
> MS. SHANER: Your Honor, I cannot go forward and zealously advocate for my client and I would move to withdraw therefore. I am too upset to go forward with my license, my liberty, my reputation and my livelihood pending, and I am afraid that it will have prejudicial effects on my zealous advocacy and on Mr. Burriss.
>
> THE COURT: I understand that. The motion is denied. I am not taking that matter up now. You will proceed. We're going to pick a jury today. We'll take up the matter after the case.

A246. Thus, the threatened sanctions were sufficiently serious to scare Shaner and to cause her to put her own interest in defending her professional reputation above the interests of Gray-Burriss. Christmas admitted at the conclusion of trial that the show-cause order "chilled my representation and that of Ms. Shaner." A1033.

Repeatedly, the District Judge ruled that Shaner (not Christmas) was up to the task of defending the case. A20; A110; A234; A1064. Although there is authority that a conflict faced by one of multiple attorneys does not violate the

40

Sixth Amendment if "the defendant's overall representation is not impaired by any actual conflict." *Stoia v. United States*, 109 F.3d 392, 398 (7th Cir. 1997), the presence of another attorney cannot cure a conflict that significantly affects the defendant's overall representation. *See United States v. Tatum*, 943 F.2d 370, 378-79 (4th Cir. 1991) (finding that former defense counsel's conflict of interest adversely affected the defendant's representation when he assisted primary counsel and sat at the defense table during trial). Here, Shaner was not simply "standby counsel," A1044, and Christmas and Shaner were both subject to the show-cause order. *See Tatum*, 943 F.2d at 379. In any event, this brief will focus on the effect of Shaner's personal conflict on the overall defense.

This Court found that a conflict was sufficiently serious to rise to the level of ineffective assistance of counsel in *United States v. Hurt*, 543 F.2d 162 (D.C. Cir. 1976). In *Hurt*, the defendant's appellate counsel was sued by trial counsel for libel based on the appellate lawyer's argument that the trial counsel had provided ineffective assistance of counsel. *Id*. at 166. When the case was remanded for a hearing in the district court on the merits of this ineffective assistance claim, appellate counsel contended that the pending libel suit created a conflict of interest for him acting as counsel the hearing. Judge Spottswood Robinson's analysis of this conflict claim is directly applicable here:

> At the outset of the hearing, appellate counsel, accompanied by his own attorney, asked to be excused as appellant's lawyer on the basis

41

of a conflict of interest. He explained that, because of the libel suit, he feared that his presentation of facts asserted in appellant's affidavit would be considered a second publication of defamatory matter, and thus would aggravate his situation. He also argued that unless leave to withdraw was granted, appellant himself was apt to be prejudiced. As counsel expressed it, 'I … feel that I am inhibited from defending or representing (appellant) on this remand proceeding for  the simple reason that I have a personal interest in this matter which may not be at all times and in every respect co-extensive and equal to his.'

Long ago, the Supreme Court instructed that '(t)he right to counsel guaranteed by the Constitution contemplates the services of an attorney devoted solely to the interests of his client,' an admonition which we ourselves have had occasion to observe. 'Undivided allegiance and faithful, devoted service to a client,' the Court declared, 'are prized traditions of the American lawyer. It is this kind of service for which the Sixth Amendment makes provision.' The crucial  question confronting us is whether appellant had that quality of service at the hearing ….

Here, however, the record demonstrates that these considerations were set for naught by appellate counsel's seemingly unalterable attitude toward the lawsuit in which he was personally involved. The inevitable though tiny risk of a defamation suit from professional activities in a judicial proceeding had materialized. The chance that the suit might be lost, though small, had not abated. The stakes, measured by the gravity of defamation of professional character, were high. That these personal concerns loomed large to counsel is manifest from their assertion over and over again as grounds for leave to retire from appellant's representation, and from his strenuous efforts three in all to free himself from the ordeal. There is no reason whatever to doubt counsel's sincerity; and however counsel's apprehensions might appear to a disinterested observer, the record indulges only the conclusion that to counsel they were very real.

We think, then, that the District Court erred in conducting the hearing without appointing another lawyer for appellant. The first essential element of effective assistance of counsel is counsel able and willing to advocate fearlessly and effectively, and the libel suit generated far too great a dilemma for appellate counsel to permit him that range of action .…

Nor are we able to say that appellant was not prejudiced. The Government points out that appellant does not suggest in retrospect anything that appellate counsel intended to undertake at the hearing that he did not feel free to do. This attempt to minimize the problem ignores the incontrovertible fact that appellate counsel was adamantly opposed to doing anything at all, and that he proceeded only because the court ordered him to do so and threatened to hold him in contempt if he refused. We have recognized that 'proof of prejudice may well be absent from the record precisely because counsel has been ineffective'; we recognize, too, that lawyers frequently do not realize their own shortcomings. The pressure under which appellate counsel labored may well have resulted in subtle restraints which not even he could pinpoint or define. Try as we might, we could not approximate the effect which the overhanging threat of the libel suit had on the vigor of counsel's endeavors at the remand hearing.

In sum, prejudice in the circumstances involved here is incapable of any sort of measurement. We believe, then, that we must heed the Supreme Court's admonition that '(t)he right to have the assistance of counsel is too fundamental and absolute to allow courts to indulge in nice calculations as to the amount of prejudice arising from its denial.'

*Id.* at 166-167.

There are many similarities between *Hurt* and this case. As in *Hurt*, the attorneys here were subject to an open potential adverse judicial proceeding at the time of the district court hearing in question. Also as in *Hurt*, the attorneys here brought the potential conflict to the district court's attention on multiple occasions and stressed the potential prejudice to their client's interests as a result. As in *Hurt* too, Shaner here retained her own independent counsel to represent her before the district court on these issues. Finally, as in *Hurt*, here "there is no room whatsoever

43

to doubt counsel's sincerity" and counsel's "apprehensions" with regard to these conflict concerns.

The conflict in this case is more concrete than in *Hurt*. While the attorney in *Hurt* faced a "tiny risk of a defamation suit," the attorneys here faced the multiple threats of "sanctions," and/or "a complaint [being] filed against each of them with [the district] Court's Grievance Committee," and/or "referrals to the D.C. Bar" and/or other actions which posed direct and substantial threats to their professional reputations and livelihoods. While the attorney in *Hurt* retained an unidentified attorney to represent him with respect to the conflict of interest in the district court, attorney Shaner retained one of the most high-powered attorneys in the District, from one of the most powerful firms in the world,[5] to protect her vital professional interests against an order that Shaner found "terrifying." A1049. Finally, while in *Hurt* the "appellant d[id] not suggest in retrospect anything that appellate counsel intended to undertake at the hearing that he did not feel free to do," the record here suggests a number of such things, most especially the improper handling of Gray-Burriss' closing argument at trial.

---

[5] Shaner retained attorney Henry "Hank" Asbill from the Jones Day firm. Asbill has been recognized as one of the "Top 100 Super Lawyers" in Washington, D.C.; one of the "Top 100 Trial Lawyers" in Washington, D.C.; one of the "Best Lawyers in America;" and as a "Fellow" of the "American College of Trial Lawyers." http://www.jonesday.com/hasbill/.

44

"[N]o aspect of [criminal trial] advocacy could be more important than the opportunity finally to marshal the evidence for each side before submission of the case to judgment." *Herring v. New York*, 422 U.S. 853, 862 (1975). This is because

> closing argument serves to sharpen and clarify the issues for resolution by the trier of fact in a criminal case. For it is only after all the evidence is in that counsel for the parties are in a position to present their respective versions of the case as a whole. Only then can they argue the inferences to be drawn from all the testimony, and point out the weaknesses of their adversaries' positions. And for the defense, closing argument is the last clear chance to persuade the trier of fact that there may be reasonable doubt of the defendant's guilt.

*Id.* Because of this obvious importance, closing arguments are the stuff of legend in the history and lore of trial practice.

Against this backdrop, consider the handling of the defense's closing argument on the morning of November 28, 2012. After the Government gave its closing argument, the Court adjourned for a 15-minute recess at 10:55 a.m. A993. Shaner, who was responsible for handling the closing argument, told Christmas that she was losing her voice and could not make the closing argument. A994. Christmas presented the closing argument instead. *Id.* Unsurprisingly, Christmas' unprepared closing was rambling, incoherent, and unorganized. A994-1023. During the show-cause hearing just hours later, however, Shaner advocated vigorously in her own defense at the hearing. A1040-50. It is reasonable to infer from these facts that Shaner was unable to put her client's interests above her own on this critical occasion.

45

Fortunately in this case, we do not have to merely "infer" how the pending Order to Show Cause affected Shaner's thinking because she told the district court directly. "Your honor, I want to speak briefly to the pendency of a very serious life changing order hanging over my head during trial." A246. In *Shark*, 51 F.3d at 1076, this Court found "fair to say that any rebuke [from a trial court] sufficient to create a cognizable conflict of interest would, virtually by hypothesis, so hamper counsel's zealous representation as to violate a defendant's right to a fair trial." Shaner's repeatedly expressed fears regarding the consequences of Judge Robert's show-cause order plainly meet that test. A1050-51. And as in *Hurt*, her "attitude" about those fears was "seemingly unalterable." Nothing more is required to demonstrate that the seriousness of these threats to Shaner created an actual conflict of interest for her during Gray-Burriss' trial.

In total, the record shows that the conflict adversely affected Shaner's performance because she was "preoccupied with [her] own disciplinary proceeding" and had a real interest in deflecting any blame to her co-counsel, and thus could not provide adequate representation for her client. *United States v. Greig*, 967 F.2d 1018, 1024 (5th Cir. 1992) ("counsel [was] plagued by the fear of [court-imposed] sanctions"); *see also Armienti*, 234 F.3d at 825 (noting that an actual conflict may exist if a conflict causes an attorney "to devote less time to [the defendant's] representation … and to be ill-prepared and distracted at trial").

46

Shaner did not advocate as vigorously as she otherwise may have because she was focused on preserving her time and energy for her own defense. As in *Greig*, where the court found an adverse effect because the attorney was so preoccupied that he failed to object at appropriate times, 967 F.2d at 1024, the record here demonstrates that, during the same time that Shaner was taking time to reach out to her Jones Day attorneys, Shaner failed to adequately communicate with her co-counsel regarding her client's trial. A1051. Above and beyond the closing argument failures, the overall record amply establishes that Shaner was preoccupied with her own defense, did not act as effectively on behalf of her client, and thus her conflict adversely affected her performance at trial. *Greig*, 967 F.2d at 1024. For these reasons, the record establishes, without need for remand, that Gray-Burriss is entitled to a new trial with a defense by conflict-free counsel.

### 3.    Alternatively, Remand Is Necessary Because the District Court Failed to Satisfy Its Duty of Inquiry

If this Court finds that an actual conflict is not apparent from the record, a remand is necessary because the District Court failed to inquire into the potential conflict of interest. Trial courts have an "independent duty to ensure that criminal defendants receive a trial that is fair and does not contravene the Sixth Amendment." *Wheat v. United States*, 486 U.S. 153, 161 (1988). This duty requires trial courts to inquire into the possibility of a conflict of interest whenever evidence of such a conflict has been brought to the court's attention. *See Wood v.*

47

*Georgia*, 450 U.S. 261, 272 (1981) (the "record … demonstrate[s] that the possibility of a conflict of interest was sufficiently apparent at the time of the revocation hearing to impose upon the court a duty to inquire further."); *cf. United States v. Green*, 680 F.2d 183, 190 n.12 (D.C. Cir. 1982) ("'[U]nless the trial court knows or reasonably should know that a particular conflict exists, the court need not initiate an inquiry [into a potential conflict of interest.]'") (quoting *Cuyler*, 446 U.S. at 347); *California v. Bonin*, 765 P.2d 460, 476-77 (Cal. 1989) (reversible error where defense counsel identified conflict and trial court failed to conduct hearing).

Shaner moved to withdraw as trial began, waving a red flag that the show-cause order prevented her from effectively representing her client. A246. These actions were more than sufficient to trigger a duty of inquiry on the trial court, which the court then failed to timely satisfy. *See, e.g.*, *Atley v. Ault*, 191 F.3d 865, 867 (8th Cir. 1999) ("A duty of inquiry is triggered when an attorney files a pre-trial motion with the court asserting that one's personal interests may prevent her from providing effective representation at trial."). Much like the trial judge in *Atley*, Judge Roberts defended his ruling by virtue of his past relationship with counsel and the fact that he had seen her argue effectively on behalf of her clients in the past. *Compare* A20 ("This court has seen Ms. Shaner under fire before, and she has held her own like the experienced professional that she is. The court was

48

fully confident that she would not falter in her duty to her client."), *with Atley*, 191 F.3d at 868 ("the trial court … stat[ed] that Weinberg had been a zealous advocate … and that, based on its personal acquaintance with Weinberg, the Court had no doubts that he would continue to zealously represent petitioner."). Both courts similarly cited the need to avoid delay. *Compare* A20, *with Atley*, 191 F.3d at 868 ("it appeared that petitioner was engaged in an attempt to delay the proceedings."). In *Atley*, the Eighth Circuit concluded that the trial court had erred in failing to conduct an inquiry regarding the nature of the conflict raised in defense counsel's motion to withdraw. *Id*. at 871. The same result should obtain here.

After Shaner brought to the District Court's attention her distress regarding her inability to provide effective representation, the District Judge had an obligation to inquire into the possibility of a conflict of interest. *See Atley*, 191 F.3d at 867; *Minnesota v. Paige*, 765 N.W.2d 134, 141 (Minn. Ct. App. 2009) (holding that counsel's representations that he could not provide effective representation to his client along with his failure to act diligently on his client's behalf triggered a duty of inquiry); *Carter v. Virginia*, 400 S.E.2d 540, 542-43 (Va. Ct. App. 1991) (duty of inquiry triggered where attorney represented that he could not provide effective representation to his client because of his interest in defending his professional reputation against the court's threatened sanctions).

49

When a trial court fails to conduct an appropriate inquiry in response to a timely assertion of a conflict of interest, and if that failure leaves an appellate court with an insufficient record to resolve the alleged conflict claim, it is appropriate to remand the case to the district court for an evidentiary hearing on the conflict issue. *See Wood*, 450 U.S. at 273 (remanding "to determine whether the conflict … that this record strongly suggests actually existed."); *United States v. Todd*, 287 F.3d 1160, 1164 (D.C. Cir. 2002) (remanding to allow the defendant to develop his ineffective assistance of counsel claim based on his lawyer's conflict of interest). At a minimum, remand is necessary.

### C.    Traditional *Strickland* Ineffective Assistance

*Strickland* requires an appellant to show (1) that "counsel's representation fell below an objective standard of reasonableness … [measured] under prevailing professional norms," (known as "the performance prong") and (2) that the "deficiencies in counsel's performance … [were] prejudicial to the defense." *Strickland*, 466 U.S. at 687-88, 692. The defendant must show "specific errors by trial counsel." *United States v. Cronic*, 466 U.S. 648, 666 (1984).

### 1.    Defense Counsel's Inarguably Deficient Performance

The record facts recounted above surrounding the "preparation" and "presentation" of Gray-Burriss' defense below are so outlandish, so far below any standard of reasonable professional conduct and competence, that the first prong is

50

beyond dispute. Although trial counsel is afforded wide latitude to account for tactical decision-making, that is decidedly not what was happening here. Instead, any fair reading of this record demonstrates that the misconduct below was the result of dramatically unprepared and obviously confused counsel, rather than shrewd tacticians. *See Ward v. United States*, 995 F.2d 1317, 1322 (6th Cir. 1993).

*Advice-of-Counsel Defense:* "A defendant is entitled to an advice-of-counsel instruction if he introduces evidence showing: (1) he made full disclosure of all material facts to his attorney before receiving the advice at issue; and (2) he relied in good faith on the counsel's advice that his course of conduct was legal." *United States v. DeFries*, 129 F.3d 1293, 1308 (D.C. Cir. 1997). "The district court is required to give this instruction if there is 'any foundation in the evidence sufficient to bring the issue into the case, even if that evidence is weak, insufficient, inconsistent, or of doubtful credibility." *Id.* (internal citations and quotation marks omitted). In the specific context of embezzlement charges against union officials, *DeFries* found reversible error in the failure to provide an advice-of-counsel instruction, even though the defense was far from airtight. *Id.* at 1309-10.

Here, defense counsel clearly intended to present advice-of-counsel as a defense, but they failed to request an instruction, or to present the evidence in admissible form. As Gray-Burriss summarized *pro se*:

> As a result of [a competing union's] and NLRB's actions, NASPSO was left with no operating funds. Mr. Bruce Goodman, ESQ who served as NASPSO Vice President and General Counsel was instrumental in maintaining NASPSO as a labor organization. During this time, Mr. Goodman advised me and the Executive Board that it was acceptable to borrow funds from the Pension allocation as long as it was returned with interest. We used these borrowed funds to keep NASPSO functioning.

A197. The Government itself elicited testimony that Goodman was present during a meeting where Gray-Burriss (and apparently, Goodman) were unconcerned with allegations regarding the mishandling of ERISA funds. A317-24. Moreover, the Government established that Goodman represented NASPSO before the NLRB regarding complaints that NASPSO was mishandling such employee benefits. A1253-65. There is ample reason to believe that Goodman advised Gray-Burriss, a non-lawyer who held only a GED, A285, that his actions were legal.

In a painful-to-read portion of the transcript, Shaner questioned defense witness David Levinson (an NLRB investigator and later NASPSO's attorney) regarding an August 2006 meeting among the DOL, NLRB, and Goodman. A804. Shaner then attempted to ask Levinson about statements that Goodman made at the hearing. When the Government objected, Shaner proffered the following testimony:

> [R]ight up to the time of the civil lawsuit, Bruce Goodman was being questioned in the presence of David Levinson, and I believe Caleb Burriss may or may not have been there, but they were trying to find out how—what could be done to resolve the issue of monies taken from the pension fund at Harbor Bank and used for operating

52

expenses, and Bruce Goodman said I told him that he should do that, that that was just fine. The government knows this because they sent an investigator to interview Bruce Goodman, plus they also have affidavits in the civil suit where that's incorporated, but the government knows this also because they sent investigators to interview Bruce Goodman, the current grand jury, and ***Bruce Goodman said, yeah, I told him he could do that, and it was—turns out I was completely wrong. I'm not an expert on ERISA law, I shouldn't have told him that.***

A804-06 (emphasis added). Between that 2006 meeting and the 2012 trial,

Goodman was disbarred for knowingly misappropriating client funds. *Id.*; *see Atty.*

*Grievance Comm'n of Md. v. Goodman*, 43 A.3d 988, 997 (Md. 2012).

Shaner tried to admit Goodman's statement through the admission-against-

interest hearsay exception:

> THE COURT: Well, I'm looking at 804(b)(3), which does not exclude a statement against interest. But that applies when the witness is unavailable. Is that the exception that you're referring to?

> MS. SHANER: I was referring to a statement against interest. ***I don't remember researching whether it dealt with availability or not.***

> THE COURT: 804 does. It applies when the witness is unavailable. It allows a statement against interest to come in as an exception to the hearsay rule. Were you referring to some other --

> MS. SHANER: No, that's the only one I was referring to.

> THE COURT: All right. ***There's no foundation that this witness is unavailable, is there?***

> MS. SHANER: ***No.***

> THE COURT: All right. Sustained.

A807-08 (emphasis added). The "research" that Shaner failed to conduct was to read the plain text of Rule 804(b).

By failing either to subpoena Goodman or to establish that he was unavailable, Shaner allowed key defense evidence to go unheard. That evidence would have been exculpatory as to the core of the overarching case that the Government presented in closing. A942-44.

*Expert Testimony*: This case presented, at heart, a question of whether Gray-Burriss could account for charges to NASPSO and, if not, whether those failures were negligent or fraudulent. A942-93. A forensic accounting—reviewing withdrawals and expenditures for authorization in union records—often is key to mounting or contesting embezzlement charges. *See, e.g.*, *United States v. Hammond*, 201 F.3d 346, 350-51 (5th Cir. 1999).

The Government presented hundreds of pages of spreadsheets to establish allegedly fraudulent accounting, or lack of accounting, in NASPSO's books. A1211-52. The Government introduced extensive testimony from ERISA investigator Elham Fayyazi regarding allegedly unauthorized handling of ERISA funds. A335-44; A349-61; A379. Then, on November 13, the Government called Kenric Michel, a DOL investigator specializing in embezzlement from unions. A479-81. His testimony continued on November 14 and 15, into late afternoon on November 19. A524; A553; A623; A682. Through Michel, the Government

54

presented days of testimony identifying the transactions for which the DOL did or did not find authorization. *See, e.g.*, A514-22. The Government's accounting was vulnerable to a competent challenge. For instance, that the Government charged (and the jury held) that Gray-Burriss embezzled by taking two paychecks for his semi-monthly salary at the end of May 2008, even though it was undisputed that Gray-Burriss then received no semi-monthly salary payment in mid-June 2008. A127; A1240. The defense unsuccessfully objected that the Government investigators were testifying as experts, but it could offer no expert testimony of its own to rebut them. *Id.*; A96-99; A358.

The District Court's order barring the defense from calling a forensic accountant paints a portrait of ineffective assistance:

> On September 27, 2012, the government filed a motion in limine to preclude the defendant from presenting under Federal Rule of Evidence 702 an expert witness at trial. The docket shows that the motion was electronically served upon [Shaner and Christmas]. The motion states that the defense asked the government if it had any expert witness discovery. See Fed. R. Crim. P. 16(a)(1)(G). The government says it complied with that rule by responding that it will not present any expert testimony. Upon complying, the government says it demanded reciprocal discovery of defense experts, as it is entitled to do under Rule 16(b)(1)(C), on numerous occasions both outside of court and during multiple status hearings in court.

> The government recites that it recently received a call from an accountant who said he would be an expert for the defense. The government states that the defense pledged to produce information about its expert witness by September 15, 2012. When the defense did not do so, the defense counsel proposed to do so in a meeting set for September 27, 2012, but canceled the meeting that day. The

55

government to date has received no Rule 16(b)(1)(C) material about the defendant's expert witness.

*     *     *

Ordinarily, the defense might be expected to aid the court … by offering some explanation about why it has not produced the Rule 16(b)(1)(C) discovery. It has certainly had that opportunity ever since it was served electronically with the government's motion 21 days ago. Indeed, the defense had an obligation to respond if it disputed the factual allegations advanced or the relief sought by the government. But the defense has filed no response at all to the government's motion. It has chosen to neither explain its actions nor oppose the government's request for relief. Whether its failure to comply with Rule 16(b)(1)(C) is willful or not is unknown, but the government's motion is deemed conceded in light of the defense's failure to respond to it.

A96-98.

Rather than hear from an expert forensic accountant for the defense, the jury endured Christmas' inept cross-examination of Michel. The transcript features page after page of sustained objections and confusing questions that misunderstood basic concepts. A564-622.

_Exclusion of All Defense Exhibits:_ The District Court excluded all defense exhibits, excepting the Government's own discovery, as a result of counsel's defaults. Before he realized that the 2009 agreement was among the undisclosed documents, Christmas essentially conceded their exclusion, A346-48, which he admitted was "ineffective assistance of counsel" when he tried in vain to admit that document. A530.

56

*Closing Argument*: Again, Shaner passed the buck to Christmas 15 minutes before closing argument, leading Christmas to deliver a rambling, disorganized summation in a month-long trial. A993-1023.

*Restitution and Forfeiture Amount*: In calculating restitution, the District Court must deduct "the value (as of the date the property is returned) of any part of the property that is returned[.]" 18 U.S.C. § 3663(b)(1)(B). Shaner protested at the hearing that Gray-Burriss had in fact repaid NASPSO in substantial part, but she was not prepared to prove that amount. A1070-73; A790-91. The District Court accepted, without objection by Shaner, the Government's representation that it was sufficient for the District Court merely to allow Gray-Burriss to seek post-sentencing adjustments. A1071. But Christmas completely dropped the ball on the related issue of forfeiture. He signed onto Government submissions agreeing that a civil judgment should be entered against Gray-Burriss in the full amount of $252,276.38, even though monies already returned, or monies paid to Fraser, could not possibly constitute proceeds in Gray-Burriss' possession. 18 U.S.C. § 981(a)(1). *See* A145-47. The Court's forfeiture order therefore provided no express mechanism for Gray-Burriss to obtain a credit for such monies. A211-13.

Moreover, a District Court must deduct from a restitution amount the value that a defendant's scheme may have conferred on the victim, even if that value is difficult to quantify. *United States v. Allen*, 529 F.3d 390, 397 (7th Cir. 2008).

57

Here, there was abundant evidence, including from the alleged victims, that Gray-Burriss' efforts benefitted them. A188-94; A855-56. And Fraser performed valuable work for NASPSO. A688-90; A856-59; A886. The idea that Gray-Burriss should be financially responsible for Fraser's entire pay during a 30-week period is absurd.

*Lack of Investigation and Preparation:* Based on the foregoing, there is no reason to doubt that, as stated in Gray-Burriss' *pro se Strickland* motion, Shaner and Christmas failed to interview witnesses identified by Gray-Burriss, to subpoena or review documents identified by him, or to engage in any meaningful investigation or trial preparation. A168-71. The Government itself could not help but note their basic failure to read trial exhibits. A392.

## 2.    Prejudice Is Clear from the Record and Certainly Warrants at Least a Remand

The record facts concerning the reasonably likely consequences of all of the foregoing instances of substandard professional conduct is self-evident. The jury was likely to be distressed, not impressed, with defense counsel's allowing the nineteen-count case with serious felony charges to go forward without introducing a single substantive defense exhibit, without using an expert accounting witness they viewed as essential, while cross-examining one witness without knowledge of what the witness said on direct and switching-off of responsibility for the client's closing argument at the last minute as if it was a hot potato. Judge Roberts

58

admitted that their unprofessionalism, which gave the appearance the defense was deliberately hiding the ball, "understandably prompted in me a reaction of distress." A1052. If an Article III judge felt that way, the jury likely felt the same as well.

As discussed in section I.E, the exclusion of Defense Exhibit 5 alone prejudiced the defense—leading the jury to make incorrect factual findings on an incomplete record, reinforcing the Government's narrative that Gray-Burriss hid the ball from the jury and NASPSO, and increasing the loss amount, forfeiture amount, and restitution amount at sentencing. When one combines that prejudice with their failings on an advice-of-counsel defense, expert testimony, closing argument, defense exhibits, forfeiture and restitution calculations, and failure to prepare or investigate, the conclusion is inescapable that counsel's errors prejudiced the defense.

More subtly, it was defense counsel's unprofessional pretrial conduct that occasioned the show-cause order that created their conflict of interest. The resulting adverse effect on counsel's performance at trial, and its further resulting impairment of the presentation of Gray-Burriss' defense at trial, were accordingly the direct consequences of defense counsel's own misconduct. No reasonably-acting defense lawyer would ever turn his back on a client's closing argument, but a lawyer disabled by a personal conflict of interest here did. The fact that the

59

conflict was part of her own creation only makes the injury worse. Counsel's ineffective assistance during the pretrial phase of this case was thus compounded into even greater ineffective assistance during the trial phase of the case.

Justice Potter Stewart once famously said with regard to determining obscenity, "I know it when I see it." *Jacobellis v. Ohio*, 378 U.S. 184 (1964) (Stewart, J., concurring). With regard to evaluating the Sixth Amendment violation in this case, this Court will equally know it when it sees it. The record below makes the case for ineffective assistance of counsel much more eloquently than any appellate brief ever could. It reads like a law school primer on what *not* to do in representing a client. What transpired in this case is outrageous.

Gray-Burriss "need *not* show that his attorney's deficient performance 'more likely than not' altered the outcome of the case." *United States v. Williams*, 358 F.3d 956, 962 (D.C. Cir. 2004) (quoting *Strickland* 466 U.S. at 693). "As this court has emphasized, '*Strickland* requires *reasonable probability,* not certainty.'" *Id.* (quoting *United States v. Gaviria*, 116 F.3d 1498, 1514 (D.C. Cir. 1997)). "'A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *Id.* (quoting *Strickland,* 466 U.S. at 694). Here, certainty exists that at least some of the jury's adverse findings resulted from ineffective assistance, and a reasonable probability exists as to the entirety of the guilty verdict.

60

If the record in *Pole*, 2013 WL 6697884, presented "colorable" claims of ineffective assistance, then the more disturbing record in this case presents such claims fully colored. Gray-Burriss' convictions below should be reversed, *Hylton*, 294 F.3d at 136, or at least remanded, on account of his *Strickland* claims. *See United States v. Mohammed*, 693 F.3d 192, 202-04 (D.C. Cir. 2012); *Moore*, 651 F.3d at 87-88; *United States v. Shabban*, 612 F.3d 693, 697-98 (D.C. Cir. 2010); *Williams*, 358 F.3d at 965.

The trial below was a comedy of errors, which was anything but funny to Gray-Burriss. Dysfunctional, unprepared, and nonresponsive defense counsel allowed a nineteen-count case with serious felony charges to go forward without introducing a single substantive defense exhibit, without using an expert accounting witness they viewed as essential, while cross-examining one witness without knowledge of what the witness said on direct and switching-off of responsibility for the client's closing argument at the last minute as if it was a hot potato. Defense counsel also tried the case—if that is even a fair word for what transpired below—with a Sword of Damocles hanging over their head as a result of the then-pending Order to Show Cause why serious sanctions should not be assessed against them for their nonfeasance. This case is a sad poster child for ineffective assistance of counsel on multiple levels, leading to a fundamentally unfair result that this Court can and should reverse.

## CONCLUSION

The Court should reverse the judgment below or remand for a hearing.

Respectfully submitted:

 /s/ *Steven M. Klepper*       
Steven M. Klepper
KRAMON & GRAHAM, P.A.
One South Street, Suite 2600
Baltimore, Maryland 21202-3201
(410) 752-6030
Email: sklepper@kg-law.com

Stephen L. Braga
Michael Baker, *Third Year Law Student*
John Gunter, *Third Year Law Student*
Stewart Inman, *Third Year Law Student*
Benjamin Wood, *Third Year Law Student*
UNIVERSITY OF VIRGINIA SCHOOL OF LAW
APPELLATE LITIGATION CLINIC
580 Massie Road
Charlottesville, Virginia 22903-1738
(434) 924-3825
Email: stevebraga@virginia.edu

*Counsel for Appellant*

62

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing brief complies with the 14,000 word type-volume limitation of Fed. R. App. P. 32(a)(7)(B) in that it contains 13,914 words, exclusive of the sections excepted under Fed. R. App. P. 32(a)(7)(B)(iii) and Circuit Rule 32(a)(1). The number of words was determined through the word-count function of Microsoft Word.

 /s/ *Steven M. Klepper*
Steven M. Klepper

## CERTIFICATE OF SERVICE

I hereby certify that, on January 24, 2014, I filed the foregoing brief with the CM/ECF system, which will cause copies to be served electronically on Counsel for the Government, Vincent J. Falvo, Jr., Esquire (vincent.falvo@usdoj.gov).

 /s/ *Steven M. Klepper*
Steven M. Klepper

63